**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| Sally Galliher, | : | Case No. 3:08-CV-2487 |
| Plaintiff, | : | |
| v. | : | **MEMORANDUM DECISION AND ORDER** |
| Commissioner of Social Security, | : | |
| Defendant. | : | |

Plaintiff seeks judicial review, pursuant to 42 U. S. C. § 405(g), of Defendant's final determination denying her claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (Act), 42 U. S. C. §§ 416 (i) and 423. Pending are the parties' Briefs on the Merits (Docket Nos. 9 and 12). For the reasons that follow, the case is remanded to the Commissioner pursuant to sentence four of 42 U. S. C. § 405(g).

### I. PROCEDURAL BACKGROUND

Plaintiff filed an application for DIB on August 23, 2004, alleging that she had been disabled since March 1, 2003 (Tr. 37-39). Upon denial of the application, both initially and upon reconsideration, Plaintiff requested a hearing, *de novo*, before an Administrative Law Judge (ALJ) (Tr. 40-42, 44-46). A hearing was conducted on January 10, 2008 before ALJ K. Michael Foley. Plaintiff, represented by counsel, Vocational Expert (VE) Carl Hartung and Medical Expert (ME) Dr. Jonathan

Nusbaum appeared and testified (Tr. 668). On February 19, 2008, the ALJ rendered an unfavorable decision (Tr. 15-22). The Appeals Council denied Plaintiff's request for review on August 20, 2008 rendering the ALJ's decision the final decision of the Commissioner (Tr. 7-9).

## II. FACTUAL BACKGROUND

Plaintiff was 5'6" tall, weighed 164 pounds and was 57 years old at the time of the hearing (Tr. 672). Plaintiff was a high school graduate who last worked in March 2003 (Tr. 673).

Plaintiff began her career as a human resources manager commencing in 1993. She supervised ten employees and lifted less than ten pounds (Tr. 675). According the VE, all of Plaintiff's past relevant work included working as a retail store manager, which was medium and skilled, and working as secretary, bookkeeper, and personnel manager, all of which were sedentary and skilled (Tr. 702-703).

Plaintiff testified that she suffered from fibromyalgia, a broken clavicle, numbness in her left hand and arm, chronic fatigue, memory and concentration problems, and cervical spine impairments (Tr. 676-677, 684-85). She took medication; however, she had no side effects from the medications her doctors prescribed. Epidural or facet injections did not relieve the symptoms (Tr. 690). In November 2006, she underwent lumbar surgery which helped relieve her pain. She was scheduled for a cervical fusion surgery in February 2008 (Tr. 677, 689).

Plaintiff estimated that she could walk on level ground for no more than one half hour without pain, that she could sit approximately twenty minutes, bend on most days, and to a certain extent use her arms and shoulders to push, pull and reach on a limited basis. She had difficulty manipulating with her left hand. She could lift no more than ten pounds and climb a flight of stairs with difficulty (Tr. 678). The ME opined that Plaintiff had no impairments, either singly or in combination, that would meet the criteria for any Listing (Tr. 694). He further opined that Plaintiff could sit for a total of six

hours in an eight-hour workday with an allowance for stretching after one hour; that she could stand or walk for thirty minutes at a time and for a total of two hours in a workday; that she could no more than occasionally lift up to ten pounds and use her hands for grasping or pushing and pulling objects weighing up to ten pounds; that she could use her hands for fine manipulation; that she could occasionally use foot controls and reach above shoulder level; that she could not climb ladders or work at temperatures below forty degrees; and that she could bend, twist, squat, stoop, crouch, and climb stairs no more than ten percent of the time (Tr. 694-696).

The VE testified that Plaintiff was capable of performing her past jobs of secretary, personnel manager and bookkeeper assuming the limitations given by the ME and included in the ALJ's hypothetical. Specifically, Plaintiff could perform her past positions of secretary, personnel manager, and bookkeeper (Tr. 703). Assuming that Plaintiff's testimony were true, the VE testified that she could not do her past work because of the postural limitations (Tr. 703-704). In fact, there was no work that she could do (Tr. 704).

### III. MEDICAL EVIDENCE

Plaintiff's bone mineral density tested lower than normal on May 8, 2002 (Tr. 364).

James N. Spindler, M.S., a psychologist, conducted an evaluation on December 18, 2004, after which he diagnosed Plaintiff with fibromyalgia, psychological stressors and absent or minimal symptoms, good functioning in all areas; interested and involved in a wide range of activities; socially effective, generally satisfied with life and no more than everyday concerns (Tr. 201).

Dr. Michael Scherer, Plaintiff's primary care physician from approximately 1990 through 2006, diagnosed and treated Plaintiff for fibromyalgia, chronic fatigue syndrome, migraine headaches, and right carpal tunnel syndrome (Tr. 233-352, 384). He ordered a computed tomography (CT) scan in April

2003.  The results were normal (Tr. 362).  On July 10, 2003, Dr. Scherer directed the hospital emergency room staff to administer an injection designed to treat migraine headaches (Tr. 260-263).  Plaintiff presented to the emergency room on November 26, 2003, after falling.  She was diagnosed with an avulsion fracture and sprain (Tr. 174).  There was, however, no evidence of dislocation (Tr. 180).  She was prescribed pain medication, a sling and a splint (Tr. 174, 181).

Numerous CT scans were taken of Plaintiff's left clavicle, ankles, brain, left shoulder and chest during 2003 and 2004.  The results showed no evidence of a fracture or dislocation (Tr. 356-363).

From January to March 2004, Plaintiff attended a total of six physical therapy sessions for her left shoulder pain.  Her pain level remained the same after six sessions.  She complained of numbness in her first, second and third digits.  She continued to perform most activities of daily living except sweeping (Tr. 183).

On April 1, 2004, Dr. Scherer administered an injection to relieve migraine pain (Tr. 255).

On October 4, 2004, Richard E. Reser, a chiropractor, opined that Plaintiff's neurological examination was normal and that Plaintiff was hypersensitive to pain due to fibromyalgia.  Although Plaintiff responded to therapy, pain persisted  (Tr. 460).  Also in October 2004, Dr. Dorsey Gilliam evaluated Plaintiff's complaints of fibromyalgia, asthma, osteoarthritis, hypertension and carpal tunnel syndrome (Tr. 190).  He concluded that Plaintiff could sit and stand at will, walk moderately, lift and or carry up to eight pounds and handle objects easily.  There was no evidence of mental impairment (Tr. 192).

On November 23, 2004, Dr. Jerry W. McCloud opined that Plaintiff had the ability to lift or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday and engage in

unlimited pushing and/or pulling (Tr. 136).  Plaintiff could not climb using a ladder, rope or scaffold and exposure to fumes, odors, dust, and poor ventilation was contraindicated (Tr. 137-139).

On March 14, 2005, Plaintiff was again injected with??? for treatment of migraine headaches as the medication prescribed in January 2005 did not provide relief (Tr. 203, 241).  On March 24, 2005, Plaintiff presented to the emergency room with total body pain (Tr. 204).  X-rays showed a fracture in Plaintiff's seventh rib with callus formation, suggesting an old injury, and degenerative changes in her spine (Tr. 210).  She was prescribed pain medication (Tr. 205).

On May 4, 2005, Dr. Michael W. Lindamood, a rheumatologist, opined that Plaintiff continued to have symptoms compatible with the working diagnosis of fibromyalgia and chronic fatigue syndrome (CFS).  He prescribed medication to treat the possible inflammatory symptoms (Tr. 219).

Dr. Elizabeth Das completed an RFC assessment on May 18, 2005, in which she opined that Plaintiff had the ability to lift or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday and engage in unlimited pushing and/or pulling (Tr. 157).  Plaintiff could occasionally climb using a ramp or stairs, never climb using a ladder, rope or scaffold and Plaintiff could frequently balance, stoop, kneel, crouch or crawl (Tr. 158).

The magnetic resonance imaging (MRI) of Plaintiff's lumbar spine and lumbosacral spine administered on June 29, 2005, revealed mild curvature of the spine, moderate degenerative disc disease at L1-2 and mild degenerative changes in the rest of the spine (Tr. 354).

The bone scan administered on July 13, 2005, showed a possible lesion on Plaintiff's sixth rib and degenerative disk disease at Plaintiff's lumbosacral junction (Tr. 226).

On July 14, 2005, Dr. Hany Iskander, an anesthesiologist, diagnosed Plaintiff with inflammation

of the sacroiliac joints and arthritis of the lumbar facet joints. There were, however, no significant neurological deficits. The course of treatment included prescriptions for pain medication, muscle relaxants and steroid injections. Plaintiff's response was excellent (Tr. 232).

On September 12, 2005, Plaintiff presented to Dr. Scherer with complaints of periodic anxiety and progressive discomfort. Dr. Scherer prescribed Xanax as needed and continued medications prescribed for treatment of chronic pain (Tr. 234).

On October 24, 2005, Plaintiff had a flare up of fibromyalgia and CFS. Dr. Scherer administered an injection of several pain medications and continued Plaintiff's prescriptions (Tr. 233).

Commencing in March 2006, Dr. Rudolph Vela, Plaintiff's primary care physician, treated Plaintiff for complaints related to asthma, fibromyalgia; fatigue; osteoarthritis; spine pain; and headaches. Inherent in this treatment was monitoring of Plaintiff's medications (Tr. 391-438, 512-524, 594-597).

On May 24, 2006, Dr. Sam Chodisetty, a neurosurgeon, diagnosed Plaintiff with episodic left-sided weakness; chronic fibromyalgia; and a history of osteoarthritis and low bone mineral density (Tr. 385). During the neurological follow-up conducted by Dr. Chodisetty on July 25, 2006, Plaintiff reported increasing weakness and extreme fatigability. He prescribed a new medication for headaches (Tr. 382).

The MRI administered on June 5, 2006, of Plaintiff's brain showed white matter abnormality, a lesion and small venous angioma (Tr. 386).

On August 31, 2006, Dr. Amish Patel evaluated Plaintiff's complaints of right limb pain and lower back pain. Dr. Patel diagnosed Plaintiff with L5 radiculopathy, S1 radiculopathy, L5 lateral recess stenosis and L4-5 versus L5-S1 discogenic back pain (Tr. 488). On September 13, 2006, Dr. Patel

conducted a nerve conduction study which showed chronic denervation. The findings were consistent with chronic S1 radiculopathy on the right, chronic S1 radiculopathy, chronic L5 radiculopathy and chronic L5 radiculopathy (Tr. 439).

On September 28, 2006, Dr. Jay L. Smith, an anesthesiologist, noted that Plaintiff had generalized spondylosis and mild to moderate lumbar stenosis. A series of steroid injections were prescribed (Tr. 387).

The MRI of Plaintiff's brain that was administered on November 28, 2006, showed signs of a benign tumor (Tr. 452). The test, administered again on March 19, 2007, showed no significant changes (Tr. 442).

On November 30, 2006, Dr. Brian Hoeflinger performed a lumbar laminectomy to correct Plaintiff's moderate stenosis at L4-5 and a procedure to correct her lumbar radiculopathy (Tr. 388–89, 468-69). Plaintiff told Dr. Vela in December 2006 that she was doing well post-operatively (Tr. 407).

The MRI of Plaintiff's lumbar spine taken on March 16, 2007, showed degenerative changes at L5-S1, L4-L5 and L3-L4. There was evidence of disc dessication and mild disc bulge (Tr. 444). The MRI of Plaintiff's brain administered on March 19, 2007, showed no significant change since the November 2006 (Tr. 442). The magnetic resonance imaging scan of Plaintiff's cervical spine administered on March 19, 2007, showed evidence of mild to moderate stenosis at C4-5through C6-7 with no visible cord compression and hypertrophy (Tr. 443).

Dr. Hoeflinger reviewed Plaintiff's myelogram studies on April 5, 2007 and noted that the cervical MRI demonstrated diffuse degenerative changes with disk space narrowing and the thoracic portion of the study demonstrated multiple levels of degeneration. There was no evidence of spinal cord compression, nerve root impingement or spinal stenosis (Tr. 464).

Commencing on May 8, 2007, Plaintiff underwent a series of thoracic steroid injections (Tr. 481-483, 533-534, 536-540).  On June 22, 2007, Plaintiff was diagnosed with a knee strain, prescribed an immobilizer and a pain reliever (Tr. 493-500).  The MRI of Plaintiff's right knee showed a buildup of joint fluid on June 28, 2007 (Tr. 502).

In July 2007, Dr. Vela was advised that the injections resulted in marked reduction in pain for a short period of time.  The pain, however, recurred back to the baseline (Tr. 531).   On August 23, 2007, Dr. Thomas Franklin Kindl administered an intra articular facet injection to address Plaintiff's lumbar spondylosis (Tr. 530).

On September 4 and October 2, 2007, Plaintiff underwent a neurosurgical procedure designed to sever problematic nerve roots at the right T12, L1 and L2 medial branches (Tr. 528, 529).  Dr. Vela noted that Plaintiff continued to have joint pain on September 24, 2007 (Tr. 512).  Dr. Vela prescribed an anti-inflammatory medication (Tr. 512-515).

On September 25, 2007, X-rays of Plaintiff's clavicle showed a displaced and fragmented collar bone fracture (Tr. 592).  The MRI of Plaintiff's cervical spine taken on October 4, 2007, showed degenerative changes and changes in the spinal column, worse from the level of C4-C5 through C6-C7 where there was moderate spinal stenosis.  There was moderate collapse at C4-C5 and mild changes at C2-C3.  However, there were broad base bulges found at C5-C6 and C6-C7 (Tr. 573).

An MRI of Plaintiff's left shoulder was performed on October 4, 2007.  The findings were suspicious of a high grade partial tear along the distal supraspinatus tendon (Tr. 572).  Apparently, Plaintiff responded well to the cortisone injection. On October 10, 2007, Plaintiff had improved motion and no instability in the shoulder (Tr. 589).  In evaluating the healing process, a CT scan was administered on October 21, 2007.  The results showed a comminuted left clavicular fracture (Tr. 574).

In the meantime on October 15, 2007, Dr. Vela completed a physical RFC statement, opining that Plaintiff had the ability to lift or carry five to ten pounds occasionally; stand and/or walk for thirty minutes to one hour without interruption for a total of four hours in an eight-hour workday; and sit for one to two hours without interruption for a total of four to six hours in a workday. (Tr. 489). It was his opinion that Plaintiff should not or rarely climb, balance, stoop, crouch, kneel, crawl, reach and push/pull. Plaintiff was limited to no more than occasional handling, feeling, and fine and gross manipulation. Dr. Vela warned that exposure to temperatures would cause acute flare-up of Plaintiff's conditions (Tr. 490).

On October 20, 2007, Dr. B. Heck administered a steroid injection in Plaintiff's left shoulder (Tr. 584). The bone imaging of the entire body administered on October 22, 2007, showed degenerative changed in both shoulders. The complete resolution of the ribs and feet showed no abnormalities (Tr. 543). The MRI of Plaintiff's lumbar and thoracic spine taken on October 22, 2007, showed diffuse degenerative changes of the thoracic and lumbar spine and mild endplate irregularity (Tr. 575-577).

On October 26, 2007, the MRI of Plaintiff's right knee showed mild degenerative changes, mild narrowing of joint spaces, and mild irritation under her kneecap (Tr. 578).

In November 2007, Dr. Heck evaluated complaints of neck and shoulder pain and left hand numbness and weakness. Plaintiff was referred to a neurologist (Tr. 580).

On November 8, 2007, some fluid and tissue inflammation was prevalent near Plaintiff's clavicle and degenerative changes were noted in her cervical spine (Tr. 579). On November 16, 2007, Dr. Carmela Osborne performed an electrodiagnostic test, the results of which showed left radial neuropathy; acute and chronic nerve root irritation in the muscles near the left mid cervical spine; and mild left median neuropathy at Plaintiff's wrist (Tr. 571). The test was repeated on November 30, 2007,

9

showing left C7 and C8/T1 radiculopathy with evidence of acute denervation and significant acute denervation most prominent in the radial distribution (Tr. 600-601). In January 2008, Dr. Osborne reported that electrodiagnostic evidence of interval improvement of the left radial neuropathy and electrodiagnostic evidence of a left C7 radiculopathy with evidence of mild acute denervation were present (Tr. 634).

On November 21, 2007, Dr. Ashok Biyani diagnosed Plaintiff with cervical degenerative disc disease at C4-5, C5-6 and C6-7 and left clavicle fracture (Tr. 598).

On February 6, 2008, Plaintiff began a series of facet joint injections in the cervical spine (Tr. 613, 624-625, 655-660). Plaintiff reported that the injections relieved almost 100% of her pain for three hours (Tr. 659). Plaintiff subsequently underwent a rhizotomy on various levels of her cervical spine (Tr. 661). The CT scans of Plaintiff's thoracic and cervical spine taken on February 11, 2008, showed comminuted mid-left clavicular fracture, subacute posterior left fourth and fifth rib fractures in the thoracic spine and moderate mid cervical facet hypertrophic changes in her cervical spine indicating cervical disc displacement (Tr. 606-607).

## IV. STANDARD OF DISABILITY

DIB are available only for those who have a "disability." *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); *See also* 20 C.F.R. § 416.920). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A)).

The Commissioner's regulations governing the evaluation of disability for DIB are found at 20

C.F.R. § 404.1520. The five sequential steps of review follow.

First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (*citing Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990)).

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability. *Id.* A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled. *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001)(internal citations omitted) (second alteration in original)). If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates. *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4)).

## V. THE ALJ'S FINDINGS

The ALJ made the following findings:

1. Plaintiff met the insured status requirements of the Act through December 31, 2008.

2. Plaintiff had not engaged in substantial gainful activity since March 17, 2003, the alleged onset date.

3. Plaintiff had the following combination of impairments: treated fibromyalgia with a

11

> component of fatigue, degenerative disc disease in the lumbosacral spine treated with a laminectomy and radiofrequency ablation, some cervical spine problems, mild right knee effusion and a status post left clavicle fracture. Plaintiff did not have any impairment or combination of impairments that met or medically equaled any of the impairments listed in 20 C. F. R., Part 404, Subpart P, Appendix 1 of 20 C. F. R. §§ 404.1520(d), 404.1525 and 404.1526.
>
> 4. Plaintiff had the RFC to perform some sedentary work. She could sit for one hour at a time but she must be afforded the opportunity to stretch for a minute or two. She could sit for a total of six hours in a workday and stand/walk for thirty minutes at a time for a total of two hours in a workday. Plaintiff could lift five pounds frequently and ten pounds occasionally. She could use her hands for fine manipulation, simple grasping, and pushing and pulling to a five or ten pound limit. Plaintiff could operate foot controls no more than occasionally. She could bend, twist, squat, stoop, crouch and climb stairs less than 10% of the time. She could not work in temperatures below 40 degrees.
>
> 5. An individual of Plaintiff's age, education, vocational background and with her RFC was capable of performing Plaintiff's past relevant work as a secretary and as a personnel manager, both of which are sedentary and skilled work.
>
> 6. Plaintiff was not under a disability as defined under the Act.

(Tr. 15-22).

## VI.  STANDARD OF REVIEW

The federal district court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g). Title 42 U.S.C. § 405(g) permits the district court to conduct judicial review over the final decision in a civil action. *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832-833 (6th Cir. 2006). Judicial review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *Elam ex rel. Golay v. Commissioner of Social Security*, 348 F.3d 124, 125 (6th Cir. 2003) (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *Longworth v.*

*Commissioner Social Security Administration*, 402 F.3d 591, 595 (6th Cir. 2005) (*citing Warner v. Commissioner of Social Security,* 375 F.3d 387, 390 (6th Cir.2004) (*quoting Walters v. Commissioner of Social Security,* 127 F.3d 525, 528 (6th Cir. 1997)). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007).

In deciding whether to affirm the Commissioner's decision, it is not necessary that the court agree with the Commissioner's finding, as long as it is substantially supported in the record. *Id.* (*citing Her v. Commissioner of Social Security,* 203 F.3d 388, 389-90 (6th Cir. 1999)). The substantial evidence standard is met if a "reasonable mind might accept the relevant evidence as adequate to support a conclusion." *Longworth, supra,* 402 F. 3d at 595 (*citing Warner, supra*, 375 F.3d at 390) (*citing Kirk v. Secretary of Health & Human Services,* 667 F.2d 524, 535 (6th Cir. 1981) *cert. denied*, 103 S. Ct. 2478 (1983) (internal quotation marks omitted)). If substantial evidence supports the Commissioner's decision, this Court will defer to that finding "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Id.* (*citing Warner, supra*, 375 F.3d at 390) (*quoting Key, supra*, 109 F.3d at 273).

## **VII. DISCUSSION**

Plaintiff presented three arguments. First, the ALJ failed to properly evaluate Plaintiff's chronic fatigue syndrome as a medically determinable impairment. Second, the ALJ failed to properly evaluate Plaintiff's combination of impairments. Third, the ALJ failed to give appropriate weight to Dr. Vela's opinions. Plaintiff seeks a reversal.

Defendant argues that substantial evidence supports the ALJ's determination that the symptoms

associated with chronic fatigue syndrome are not severe. Defendant further contends that there is substantial evidence to support the ALJ's RFC determination. Overall, the ALJ's decision is supported by substantial evidence and the Court should affirm the denial of disability benefits.

**1.    CHRONIC FATIGUE SYNDROME (CFS).**

Plaintiff argues that the ALJ erred at step three of the sequential evaluation by not finding that the diagnosis of CFS and its resulting symptoms met or equaled the Listing. It was severe because Plaintiff had three abnormal brain scans between June 2006 and July 2007.

Chronic fatigue syndrome is recognized by the Center for Disease Control (CDC) as a disease. *Buxton v. Halter*, 246 F. 3d 762, 764 fn. 1 (6th Cir. 2001). It is diagnosed mainly through a process of elimination, when a physician is unable medically to pinpoint the cause(s) of a patient's symptoms (such as fatigue, weakness, pain, etc.). *Id.* Chronic fatigue syndrome is a systemic disorder consisting of a complex of symptoms that may vary in incidence, duration, and severity. TITLES II AND XVI: EVALUATING CASES INVOLVING CHRONIC FATIGUE SYNDROME (CFS), SSR 99-2p, 1999 WL 271569, *1, April 30, 1999. It is characterized in part by prolonged fatigue that lasts six months or more and that results in substantial reduction in previous levels of occupational, educational, social, or personal activities. *Id.* In accordance with criteria established by the CDC, a physician should make a diagnosis of CFS "only after alternative medical and psychiatric causes of chronic fatiguing illness have been excluded" *Id.* (*citing* ANNALS OF INTERNAL MEDICINE, 121:953-9, 1994)).

Under the CDC definition, the hallmark of CFS is the presence of clinically evaluated, persistent or relapsing chronic fatigue that is of new or definite onset (i.e., has not been lifelong), cannot be explained by another physical or mental disorder, is not the result of ongoing exertion, is not substantially alleviated by rest, and results in substantial reduction in previous levels of occupational,

educational, social, or personal activities. *Id.* Additionally, the current CDC definition of CFS requires the concurrence of four or more of the following symptoms, all of which must have persisted or recurred during six or more consecutive months of illness and must not have pre-dated the fatigue:

1. Self-reported impairment in short-term memory or concentration severe enough to cause substantial reduction in previous levels of occupational, educational, social, or personal activities;
2. Sore throat;
3. Tender cervical or axillary lymph nodes;
4. Muscle pain;
5. Multi-joint pain without joint swelling or redness;
6. Headaches of a new type, pattern, or severity;
7. Unrefreshing sleep; and
8. Postexertional malaise lasting more than 24 hours.

*Id.* at 1-2.

Within these parameters, the ALJ could not have concluded that CFS was a medically determinable impairment equivalent to a listed impairment. The documented evidence shows that Plaintiff was treated for CFS on February 24, 1992 (Tr. 171). The abnormality in the brain scans taken on June 5, December 12, 2006 and November 28, 2008, was attributed to scattered small white intensities and small venous angioma of the frontal lobe (Tr. 386, 452. 547). Even if the Magistrate assumes that Plaintiff suffered from CFS, there is no documented evidence of prolonged fatigue that lasted six months or more, or that the concurrence of more than two of the symptoms delineated above that have persisted or recurred during six or more consecutive months of illness. Remand to the ALJ for further discussion of this issue is futile since Plaintiff has failed to present medical signs and laboratory findings that would establish the existence of CFS as a medially determinable impairment or that the symptoms are of the severity to be disabling.

2.    **THE COMBINATION OF IMPAIRMENTS.**

Plaintiff contends that the ALJ failed to consider the CFS, fibromyalgia, migraines and right knee effusion in addressing the cumulative effects of her impairment.

In the Sixth Circuit, a statement--"[t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments...." suffices to show that the ALJ considered the effect of the combination of impairments. *Booth v. Commissioner of Social Security,* 2009 WL 580312, *6 (N. D. (Ohio 2009) (*citing Gooch v. Secretary of Health & Human Services*, 833 F.2d 589, 592 (6th Cir. 1987) *cert. denied sub nom Gooch v. Bowen*, 108 S. Ct. 1050 (1987) (finding that the ALJ considered claimant's ailments in combination because he noted that "a combination of impairments" did not meet the Listings, and discussed his "impairments"); *Loy v. Secretary of Health & Human Services,* 901 F.2d 1306, 1310 (6th Cir. 1990)).

The Magistrate finds that the ALJ's statement that he considered the combination of impairments sufficient. Since there is actually no medically determinable impairment of CFS, the ALJ considered fatigue as a component of fibromyalgia and he considered left knee effusion. He did not consider the migraine headaches in combination as Plaintiff presented no documentation of treatment for a headache since September 24, 2007 (Tr. 512). The Magistrate does not find that the ALJ failed to consider fibromyalgia with a component of fatigue and left knee effusions in combination with the other impairments. Since his factual finding is not legally deficient, the Magistrate does not disturb this finding.

3.    **THE TREATING PHYSICIAN RULE**

The first prong of the Plaintiff's assignment of error suggests that Dr. Vela is a treating physician, that his opinions are entitled to controlling weight and that in the alternative, the ALJ failed

16

to give a reason for rejecting Dr. Vela's findings. The second prong suggests that the ALJ erred in relying on the ME's testimony, erroneously rejecting Dr. Vela's opinion regarding her RFC.

The procedural regulation requires the Commissioner to consider all relevant information in the case record. 20 C. F. R. § 404.1524a (Thomson Reuters/West 2009). Reversal is required if the agency fails to follow its own procedural regulations requiring the agency to give good reasons if it fails to give weight to a treating physician's opinions in the context of a disability determination. *Woodard v. Astrue*, 2009 WL 2065781, *3 (M. D. Tenn. 2009) (*citing Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544 (6th Cir. 2004) (*citing* 20 C.F.R. § 404.1527(d)(2)). An ALJ must give the opinion of a treating source controlling weight if he or she finds the opinion to be well supported by medically acceptable clinical and laboratory diagnostic techniques and consistent with the other substantial evidence in the case record. *Id.*

When the opinion of a treating source is not accorded controlling weight, an ALJ must consider such factors as the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source in determining what weight to give the opinion. *Id.* (*citing Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985)). This requirement of reason-giving exists to (1) enlighten a claimant who knows that his or her physician has deemed him or her disabled, (2) ensure that the ALJ properly applied the treating physician rule and (3) permit meaningful review of the ALJ's application of the rule. *Id.* (citations omitted ).

Plaintiff has been deprived of meaningful judicial review as the Magistrate cannot ascertain if the ALJ considered Dr. Vela a treating source, if he attributed controlling or any weight to Dr. Vela's opinions or if he discounted Dr. Vela' opinions. The ALJ failed to follow the procedural regulations

17

requiring the agency to attribute controlling weight to the treating physician or give good reasons for failure to give weight to a treating physician's opinions in the context of a disability determination. On remand, the ALJ must consider all evidence presented by Dr. Vela and explain the weight attributed to such opinions. The Commissioner shall issue a new decision including a determination of disability based on this analysis and whether Plaintiff can perform sedentary work and is disabled.

Ironically, the only opinion that the Magistrate can state with certainty that the ALJ adopted was the opinion that Dr. Vela made with respect to Plaintiff's RFC. Thus, the argument that the ALJ's residual functional capacity was based on, is specious.

## VII. CONCLUSION

Based on the foregoing, this case is reversed and remanded to the Commissioner pursuant to sentence four for consideration of all evidence presented by Dr. Vela, to provide an explanation of the weight attributed to such opinions and to determine, if based on these opinions, Plaintiff can perform sedentary work and whether Plaintiff is disabled. The Commissioner shall issue a new opinion incorporating the results of this analysis.

So ordered.

/s/ Vernelis K. Armstrong
United States Magistrate Judge

Date: October 30, 2009